# In the United States Court of Federal Claims

No. 17-1969C

(E-Filed:  May 29, 2019)

|  |  |  |
|---|---|---|
| THE BOEING COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Contract; Cost Accounting |
| | ) | Standards Dispute; Failure to |
| | ) | Establish Jurisdiction for Illegal |
| v. | ) | Exaction Claim; Cross-Motions for |
| | ) | Summary Judgment, RCFC 56; |
| THE UNITED STATES, | ) | Waiver of Claims. |
| | ) | |
| Defendant. | ) | |
| | ) | |

Charles J. Cooper, Washington, DC, for plaintiff.  Michael W. Kirk, Howard C. Nielson, Jr., John D. Ohlendorf, and Seth H. Locke, of counsel.

Erin K. Murdock-Park, Trial Attorney, with whom were Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, Elizabeth M. Hosford, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Arthur Taylor and Kara M. Klaas, Defense Contract Management Agency, Chantilly, VA, of counsel.

## OPINION

CAMPBELL-SMITH, Judge.

This case is before the court on dispositive cross-motions, brought under Rules 12(b)(1), 12(b)(6), 12(c) and 56 of the Rules of the United States Court of Federal Claims (RCFC).  Plaintiff filed a motion for judgment on the pleadings, ECF No. 11, which was countered by defendant's motion to dismiss, or, in the alternative, motion for summary judgment, ECF No. 15.  Replies were filed by plaintiff, ECF No. 16, and by defendant, ECF No. 17; oral argument was held on August 1, 2018, ECF No. 20 (oral argument transcript).

The court ordered supplemental briefing on topics discussed at oral argument.  See ECF No. 18 (order).  Plaintiff's supplemental brief was filed on September 21, 2018.  See ECF No. 22.  Defendant's supplemental response brief was filed on November 2, 2018.

See ECF No. 27.  Finally, plaintiff's supplemental reply brief was filed on November 20, 2018.  See ECF No. 28.

The focus of this lawsuit is on the application of cost accounting standards to a contract between the United States military and The Boeing Company (Boeing).  For the reasons set forth below, plaintiff's motion for judgment on the pleadings is **DENIED**, and defendant's combined motion to dismiss and motion for summary judgment is **GRANTED**.

I.    Background

Boeing contracts with the government to provide military aircraft and related services; the division of Boeing implicated here had the United States Department of Defense as its primary customer.  ECF No. 1 at 8-9 (complaint).  This suit challenges a contracting officer's final decision on a government claim, issued by the Defense Contract Management Agency (DCMA) on December 21, 2016.  See id.; ECF No. 1-2 at 2-9.  Plaintiff also challenges DCMA's subsequent rejection of Boeing's related claim on November 21, 2017.  ECF No. 1 at 7-8; ECF No. 1-1 at 2-3.  The gravamen of plaintiff's complaint is that the government incorrectly applied cost accounting standards (CAS), which are set forth in 41 U.S.C. §§ 1501-1506 (2012) and 48 C.F.R. § 9903.201-4 (2018).[1]  ECF No. 1 at 1.  Plaintiff seeks relief regarding one representative contract, Contract No. N00019-09-C-0019.  Id.; ECF No. 1-2 at 4.

However, plaintiff also seeks declaratory relief that would apply to "each of the relevant contracts between Boeing and the United States."  ECF No. 1 at 35.  Even if this request for relief is limited to the Boeing division that is identified in the complaint, that division entered into "hundreds of contracts" from 1992 through 2015.  Id. at 9.  Much of the complaint addresses Federal Acquisition Regulation (FAR) 30.606, which, according to plaintiff, "violates the CAS statute."[2]  Id. at 5.  Plaintiff's challenge to FAR 30.606 is multi-faceted, but only a few aspects of that challenge will be examined in detail in this opinion.  At oral argument, plaintiff noted that Boeing has raised this type of challenge to FAR 30.606 in three suits before the undersigned, and in twelve cases before the board of contract appeals.  ECF No. 20 at 17-18.  Defendant argued that the impact of declaratory

---

[1]      All citations in this opinion are to the current version of Title 48 of the Code of Federal Regulations, known as the Federal Acquisition Regulation (FAR), unless otherwise noted.

[2]      The specific provision challenged by plaintiff is FAR 30.606(a)(3)(ii), which is referred to more generally in this opinion as "FAR 30.606."  See ECF No. 11-1 at 20 (asserting that the CAS statute requires what "FAR 30.606(a)(3)(ii) purports to bar").

relief invalidating FAR 30.606 would affect "thousands of contracts across the Government." Id. at 46-47.

In the representative contract, FAR 30.606 prevented Boeing from offsetting "eight simultaneous accounting changes" which "had mixed effects on the composition of Boeing's pool of costs on its CAS-covered contracts." ECF No. 1 at 3, 5. The first three counts of the complaint could be characterized as claims founded on the contract (or contracts) between Boeing and the United States. Id. at 31-34. The fourth count of the complaint asserts that an illegal exaction occurred when FAR 30.606 was applied to Boeing's contract, in violation of 41 U.S.C. § 1503(b). Id. at 34-35. When only the representative contract is considered, Boeing asserts that the government's claim for $1,064,773 is invalid, and that damages for the payments paid by Boeing on the government's claim, plus interest, should be awarded to Boeing. Id. at 35.

FAR 30.606, in relevant part, went into effect on April 8, 2005. ECF No. 15-1 at 112. Boeing entered into the representative contract on December 4, 2008. Id. at 136. Boeing implemented eight simultaneous accounting changes on January 1, 2011, which were deemed to be "unilateral" changes under the FAR. ECF No. 1 at 24-29. It is these accounting changes, and their treatment under FAR 30.606 by the DCMA, that give rise to the dispute in this case.

II.     Standards of Review

        A.     Motion to Dismiss under RCFC 12(b)(1)

When reviewing a complaint to determine its jurisdiction over a plaintiff's claims, this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (citations omitted). Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Reynolds, 846 F.2d at 748 (citations omitted). If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

        B.     Motion to Dismiss under RCFC 12(b)(6) Converted to RCFC 56 Motion

When considering a motion to dismiss brought under RCFC 12(b)(6), "the allegations of the complaint should be construed favorably to the pleader." Scheuer, 416 U.S. at 236. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When the parties rely on materials outside of the pleadings, and the court must consider those materials to decide a motion brought under RCFC 12(b)(6), as is the case here, the motion must be treated as one for summary judgment. See RCFC

12(d) ("If, on a motion under RCFC 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56.").

 C.     Motion for Judgment on the Pleadings Treated as a Motion for Summary Judgment

If the parties support their arguments regarding a motion for judgment on the pleadings with matters outside the pleadings, the court will convert the RCFC 12(c) motion to a motion for summary judgment under RCFC 56. See RCFC 12(d). That is the situation in this case. See ECF No. 11-2; ECF No. 15-1; ECF No. 17-1; ECF No. 27-1; ECF No. 28-1; ECF No. 28-2. When the RCFC 12(c) motion is converted to a summary judgment motion, the parties must be given a "reasonable opportunity to present all the material that is pertinent to the motion." RCFC 12(d). The court confirmed that the briefing schedule proposed by the parties and adopted by the court afforded the parties a reasonable opportunity to brief their dispute under the standard applicable to RCFC 56. See ECF No. 20 at 37, 62, 65. Thus, plaintiff's motion for judgment on the pleadings will be considered pursuant to the standard of review applicable to RCFC 56. See Schultz v. United States, 5 Cl. Ct. 412, 415-16 (1984) (converting a motion for judgment on the pleadings to a motion for summary judgment in similar circumstances).

 D.     Cross-Motions for Summary Judgment

The party moving for summary judgment will prevail "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute of material fact is one that could "affect the outcome" of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted). For cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citation omitted).

III.   Analysis

Defendant has raised one jurisdictional challenge to the claims in Boeing's complaint that is persuasive to the court, and another that is not. The court will address these challenges first. The court will then consider whether the affirmative defense of waiver entitles defendant to summary judgment and compels dismissal of plaintiff's claims on the merits.

A.      Jurisdictional Challenge to Plaintiff's Illegal Exaction Claim

1.      Overview of Precedent

Plaintiff argues that there is no jurisdictional barrier to its illegal exaction claim. ECF No. 11-1 at 42-44; ECF No. 16 at 15-18; ECF No. 22 at 29-33; ECF No. 28 at 22-24.  Plaintiff relies to a great extent on three decisions of the United States Court of Appeals for the Federal Circuit:  Aerolineas Argentinas v. United States, 77 F.3d 1564 (Fed. Cir. 1996); Norman v. United States, 429 F.3d 1081 (Fed. Cir. 2005); and Stockton East Water District v. United States, 583 F.3d 1344 (Fed. Cir. 2009).  A brief review of the holdings in these cases is indeed instructive.

In Aerolineas Argentinas, the Federal Circuit set forth the analytical framework which determines whether this court possesses jurisdiction for an illegal exaction claim. 77 F.3d at 1572-78.  The jurisdictional analysis was founded, in large part, on Bell v. Hood, 327 U.S. 678, 682-83 (1946).[3]  Aerolineas Argentinas, 77 F.3d at 1572, 1574.  The Federal Circuit noted, in particular, that the Court of Claims "held that on the allegation that the government had illegally exacted money by enforcement of a regulation that was contrary to statute, the court had jurisdiction under the Tucker Act to render judgment against the United States for recovery of that money." Id. at 1573 (citing Eversharp, Inc. v. United States, 125 F. Supp. 244, 247 (Ct. Cl. 1954)).

The Federal Circuit also held that "[i]f the [plaintiffs] fail to establish that the exaction was contrary to law, that failure does not deprive the court of jurisdiction, but serves as an adjudication on the merits." Id. at 1574 (citing Bell v. Hood, 327 U.S. at 682).  This particular statement in Aerolineas Argentinas, in the court's view, is in harmony with the Federal Circuit's guidance as to a "single step" jurisdictional analysis. See Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc) ("When a complaint is filed alleging a Tucker Act claim based on a Constitutional provision, statute, or regulation, see 28 U.S.C. § 1491(a)(1) [(2012)], the trial court at the outset shall determine, either in response to a motion by the Government or sua sponte (the court is always responsible for its own jurisdiction), whether the Constitutional provision, statute, or regulation is one that is money-mandating.").  Before leaving this discussion of Aerolineas Argentinas, the court notes that plaintiff's reliance on the concurrence in that decision does not identify binding precedent. See ECF No. 16 at 17 (citing Aerolineas Argentinas, 77 F.3d at 1579 (Nies, J., concurring)).

---

[3]      The Supreme Court of the United States recently questioned whether one aspect of the Bell v. Hood jurisdictional analysis of 28 U.S.C. § 1331 (2012) is applicable in other jurisdictional inquiries.  Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co., 137 S. Ct. 1312, 1322 (2017) (quoting Bell v. Hood, 327 U.S. at 685).

In <u>Norman</u>, the Federal Circuit reviewed this court's decision to dismiss an illegal exaction claim on jurisdictional grounds, before trying a takings claim founded on the frustrated development of real estate. 429 F.3d at 1085-87. There are four relevant statements of law in <u>Norman</u>. First, the definition of an illegal exaction is set forth:

> An "illegal exaction," as that term is generally used, involves money that was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."

<u>Norman</u>, 429 F.3d at 1095 (quoting <u>Eastport S.S. Corp. v. United States</u>, 372 F.2d 1002, 1007 (1967)). Second, the Federal Circuit identified the source of this court's jurisdiction to entertain illegal exaction claims. <u>See id.</u> ("An illegal exaction involves a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment to the Constitution.") (citation omitted). Third, the <u>Norman</u> panel noted that this court has jurisdiction "over illegal exaction claims 'when the exaction is based upon an asserted statutory power.'" <u>Id.</u> (citing <u>Aerolineas Argentinas</u>, 77 F.3d at 1573; <u>Eastport</u>, 372 F.2d at 1008). Fourth, and most importantly, the Federal Circuit required the claimant to show that the violation was of a money-mandating statute:

> To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by "necessary implication," that "the remedy for its violation entails a return of money unlawfully exacted."

<u>Id.</u> (citing <u>Cyprus Amax Coal Co. v. United States</u>, 205 F.3d 1369, 1373 (Fed. Cir. 2000)).

This fourth statement of law was essential to the holding in <u>Norman</u> which upheld this court's dismissal of the illegal exaction claim on jurisdictional grounds. <u>See id.</u> at 1096 (concluding that the statute relied upon by the plaintiffs in <u>Norman</u> "does not, by its terms or by necessary implication, provide a cause of action with a monetary remedy for its violation") (citing <u>Cyprus Amax</u>, 205 F.3d at 1373). Discerning no conflict between <u>Norman</u> and <u>Aerolineas Argentinas</u>, the court concludes that Boeing also must show that 41 U.S.C. § 1503(b) is money-mandating to establish jurisdiction for its illegal exaction claim.

Finally, plaintiff cites <u>Stockton East</u> for the proposition that a contract claim and an illegal exaction claim are not incompatible, as a matter of jurisdiction, in the same suit. ECF No. 16 at 15; ECF No. 28 at 23. The court would agree that as a matter of pleading, there is no impediment to plaintiff's Count IV, the illegal exaction claim. <u>See Stockton East</u>, 583 F.3d at 1368 (noting that a party is not precluded "from alleging in the same complaint two alternative theories for recovery against the Government, for example, one for breach of contract and one for a taking under the Fifth Amendment to the Constitution"). But whether a government contractor, pursuing relief under both the

Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (2012) (CDA), as well as under the Due Process Clause, should be restricted to relief under the CDA does not appear to be a question that has been resolved in the precedential decisions binding this court.  See ECF No. 22 at 32 (noting that plaintiff "uncovered no case fitting this profile"); ECF No. 27 at 25 (noting that "there is little binding precedent directly on-point in excess of that previously cited by the Government").

It is true that the parties here have cited a number of cases on this point, but that authority is not binding for the proposition cited.  For example, there is what plaintiff characterizes as dicta from the Federal Circuit which indicates that certain takings claims are precluded in suits where breach of contract claims are asserted.  Piszel v. United States, 833 F.3d 1366, 1376 (Fed. Cir. 2016) (citations omitted).  And similar holdings have issued in decisions of this court addressing contract-based spent nuclear fuel claims, where the court has dismissed duplicative illegal exaction claims.  See, e.g., Yankee Atomic Elec. Co. v. United States, 42 Fed. Cl. 223, 237 (1998) (stating that the electric utility's "illegal exaction claim fails because the duty on which the claim is based is contractual, not statutory"), aff'd sub nom. Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000).  The court observes that while there may be valid policy reasons that counsel against duplicative CDA and illegal exaction claims, see ECF No. 27 at 28, no precedential rule that bars illegal exaction claims from suits brought in part under the CDA has yet come to the court's attention.[4]

2.    Application of Norman

The parties' briefing addresses the requirement that an illegal exaction plaintiff identify a money-mandating statute that has been violated.  The court begins with defendant's analysis, for which the principal argument was presented in its opening brief:

> Boeing points to nothing in the CAS statute that contemplates a damages action in this Court, should the statute be improperly applied. Indeed, given as noted above that any violation would necessarily arise in the context of [a] voluntary contract between the parties, it is inconceivable that Congress intended to create a separate damages remedy in this Court for a purported violation of the statute.

---

[4]    Boeing's illegal exaction claim is unusual in that Boeing seeks a reduction in its "reimbursement of the increased costs and interest that [the government] incurred as a result of two of Boeing's unilateral [cost accounting] changes."  ECF No. 15 at 13.  In the government's view, Boeing has the government's money in its pocket, unlike a typical illegal exaction claim, where the government has the plaintiff's "'money in its pocket.'" Aerolineas Argentinas, 77 F.3d at 1573 (quoting Clapp v. United States, 117 F. Supp. 576, 580 (Ct. Cl. 1954)).

ECF No. 15 at 40.  Defendant then expanded on its analysis with the following passage in its reply brief:

> Second, although Boeing attempts to equate the language in section 1503(b) with the Export Clause of the Constitution, section 1503(b) is not money-mandating.  To apply section 1503(b), Boeing must have voluntarily entered into a contract with the Government.  Conversely, a clause that mandates payment of a money remedy is one that is separate and apart from a contract.  See, e.g., Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000).  In a claim arising under the money-mandating Export Clause, no party would need to enter into any contract with the Government to ship across state lines, and thus the Government must repay any money that it collected for taxes that violated that clause.  Id. at 1373-75 (explaining why the Export Clause is money-mandating, including its "self-executing" nature); see also Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005).  Legislative history supports our assertion that Congress intended for contractors to repay the Government for the increased costs imposed by the contractor due to its unilateral changes, not that "Congress would have intended its ban on Government windfalls to have no remedy at all," as Boeing contends.  [ECF No. 16 at 18].  Rather, Congress always mandated that contractors repay the Government for its increased costs—not that contractors can request the Government to pay additional money in excess of that contractually agreed-upon.  41 U.S.C. § 1502(f)(2); [ECF No. 15-1 at 2-23, 57-63].

ECF No. 17 at 13-14.  Defendant asserts that the statute relied upon by plaintiff "is not, by itself, sufficiently money-mandating."  Id. at 12 (citing ECF No. 15 at 38-40).

Plaintiff presents a relatively brief analysis[5] of this issue:

> Second, . . . the CAS Statute itself must be read as mandating the return of windfalls the Government reaps in violation of the statute.  Section 1503 provides that, when a contractor changes its accounting practices, "[t]he Federal Government may not recover costs greater than the aggregate increased cost . . . ."  41 U.S.C. § 1503(b).  Like the Constitution's bar on export taxes, the "necessary implication" of this "unqualified proscription is

---

[5]     In the preceding two paragraphs of its brief, plaintiff appears to argue that Norman is in conflict with binding precedent.  See ECF No. 16 at 17-18.  Seeing no such conflict, the court must follow Norman.  See, e.g., Strickland v. United States, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005) (stating that this court may disregard Federal Circuit precedent only "if the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision") (citation omitted).

> that the remedy for its violation entails a return of money unlawfully exacted." <u>Cyprus Amax Coal Co. v. United States</u>, 205 F.3d 1369, 1373 (Fed. Cir. 2000). While the Government purportedly finds it "inconceivable" that Congress intended to create a separate damages remedy to compensate for violations of this clear restriction, [ECF No. 15 at 40], it is far more inconceivable that Congress would have intended its ban on Government windfalls to have no remedy at all.

ECF No. 16 at 18.

Having considered both parties' arguments as to 41 U.S.C. § 1503(b), as well as the text and context of the statute itself, the court finds defendant's arguments to be more persuasive. First, plaintiff unconvincingly asks the court to compare § 1503(b) with the Export Clause. The money-mandating nature of the Export Clause is established by the fundamental role it plays as a check on unconstitutional taxation practices and the "unqualified proscription" of the clause:

> The necessary implication of the Export Clauses unqualified proscription is that the remedy for its violation entails a return of money unlawfully exacted. Indeed, just as Congress's power to lay taxes enables it to collect money, the Export Clauses restriction on taxing power requires Congress to refund money obtained in contravention of the clause. Thus, given a fair textual interpretation, the language of the Export Clause leads to the ineluctable conclusion that the clause provides a cause of action with a monetary remedy.

<u>Cyprus Amax</u>, 205 F.3d at 1373 (citations omitted). In the court's view, section 1503(b) is not analogous to the Export Clause, and plaintiff's illegal exaction claim here is not supported by <u>Cyprus Amax</u>.

The court has also considered the context of § 1503(b). The other two provisions of this statutory section either refer disputes to the CDA dispute resolution process or assess interest in favor of the government on cost accounting price adjustments. <u>See</u> 41 U.S.C. § 1503(a), (c). Another provision of § 1503(b) is clearly for the protection of the government. <u>See</u> § 1503(b) (stating that "[a] contract price adjustment . . . shall be made, where applicable, on relevant contracts between the Federal Government and the contractor that are subject to the cost accounting standards so as to protect the Federal Government from payment, in the aggregate, of increased costs"). The provision on which plaintiff relies is, in its entirety, as follows:

> The Federal Government may not recover costs greater than the aggregate increased cost to the Federal Government, as defined by the Board, on the relevant contracts subject to the price adjustment unless the contractor made a change in its cost accounting practices of which it was aware or should

have been aware at the time of the price negotiation and which it failed to
disclose to the Federal Government.

41 U.S.C. § 1503(b).  There is no right to bring a claim for monetary damages expressly
contained in the statute, nor is such a right provided by necessary implication.  Plaintiff
has failed to meet its burden of establishing that its illegal exaction claim is founded on a
money-mandating statute, as required by Norman.  Thus, the illegal exaction claim stated
in Count IV of the complaint must be dismissed for lack of subject matter jurisdiction.
Norman, 429 F.3d at 1095-96.

      B.      Whether Plaintiff's Claim, by Its Nature, Is an Administrative Procedure
             Act Claim over which this Court Lacks Jurisdiction

      As summarized by plaintiff's counsel at oral argument, it is the government's
assertion that because Boeing should have brought its challenge to FAR 30.606 under the
Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 704 (2012), in a district court
action, jurisdiction in this court under either the CDA or the Tucker Act is not available
now.  ECF No. 20 at 29.  Defendant adds that this court has no jurisdiction over APA
claims.  E.g., Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (en banc)
(citing Murphy v. United States, 993 F.2d 871, 874 (Fed. Cir. 1993)).  Defendant first
raised this jurisdictional challenge in its opening brief, ECF No. 15 at 32-34, and the
parties have vigorously debated the issue, see ECF No. 16 at 11-14; ECF No. 17 at 8-11;
ECF No. 20 at 29-35.

      Indeed, there are circumstances in which the court must discern the true nature of
the plaintiff's claims to determine whether it has jurisdiction over a suit.  See Katz v.
Cisneros, 16 F.3d 1204, 1207 (Fed. Cir. 1994) ("Regardless of the characterization of the
case ascribed by [plaintiff] in its complaint, we look to the true nature of the action in
determining the existence or not of jurisdiction.") (citation omitted); accord, e.g., Doe v.
United States, 372 F.3d 1308, 1315 (Fed. Cir. 2004) (citations omitted).  But here
defendant asks the court to consider the true nature of a claim that plaintiff could have
brought at an earlier date under the APA.  Defendant argues:

      In other words, to be able to show that any breach of contract or illegal
      exaction occurred, Boeing first would have to have gone to a district court
      and successfully challenged FAR 30.606's validity.  It would have had to
      persuade the district court that FAR 30.606 was directly contrary to the CAS
      Statute and therefore improperly promulgated.  But Boeing failed to bring a
      timely APA challenge.

ECF No. 17 at 9.  Because defendant does not argue that the current suit could, and
should, have been brought in December 2008 in a district court, under the APA, the court
need not conduct the type of jurisdictional analysis required by Bowen v. Massachusetts,
487 U.S. 879 (1988), and its progeny.  See Suburban Mortg. Assocs., Inc. v. U.S. Dep't

of Hous. & Urban Dev., 480 F.3d 1116, 1117 (Fed. Cir. 2007) (noting that "[t]his case requires us to reexamine the jurisdictional boundary between the Tucker Act and the Administrative Procedure Act, as that boundary is understood in the light of the Supreme Court's decision in Bowen v. Massachusetts").

Defendant's jurisdictional argument regarding the nature of plaintiff's suit is largely focused on actions Boeing could have taken, but did not.  The court finds this RCFC 12(b)(1) argument, which is based on the court's lack of jurisdiction over claims under the APA, to be unpersuasive.[6]

C.    Waiver

The court turns to the parties' summary judgment arguments concerning the government's affirmative defense of waiver.  Defendant properly raised the affirmative defense of waiver in its amended answer.  ECF No. 24 at 16.  The court ordered briefing on this defense.  See ECF No. 18.  The parties cite to a number of cases addressing waiver in their supplemental briefs.  See ECF Nos. 22, 27-28.  For the sake of brevity, the court will limit its discussion to those precedential decisions of the Federal Circuit or the Court of Claims that have articulated a rationale for applying, or refusing to apply, the doctrine of waiver.

At the outset, however, the court considers plaintiff's assertion that GHS Health Maintenance Organization, Inc. v. United States, 536 F.3d 1293 (Fed. Cir. 2008) (GHS II), and the underlying trial court opinion, GHS Health Maintenance Organization, Inc. v. United States, 76 Fed. Cl. 339 (2007) (GHS I), "compel the Court to reject the Government's waiver defense."  ECF No. 28 at 6.  The court finds otherwise because, simply put, GHS II does not elaborate a standard that explains why waiver should or should not apply under the facts of this case, and GHS I is not binding precedent in this matter.

Plaintiff's reliance on GHS II is unavailing because the Federal Circuit's holding indicated that waiver should not apply in that case, but the short analysis justifying the court's rejection of the defense did not clearly indicate why the government's waiver defense was deemed to be "frivolous."  536 F.3d at 1306.  In GHS II, the court's waiver analysis is as follows:

We regard as frivolous the Government's attempt to sustain the regulation on the grounds that it was consented to by a contract that was signed by the [plaintiffs].  The [invalid regulation] was non-negotiable.  If

---

[6]     The fact that Boeing, before entering into the representative contract, did not challenge the validity of FAR 30.606 once it had been promulgated is addressed in the waiver section of this opinion.  See infra.

anything is to be derived from the contract provision, it is an inference that [the Office of Personnel Management] itself had profound doubts about the validity of the regulation.

Id.  Further, the GHS II opinion does not cite any of the lower court's discussion of waiver in GHS I.  The court cannot agree with plaintiff, therefore, that GHS II compels any particular result in this case.  See, e.g., Brecht v. Abrahamson, 507 U.S. 619, 631 (1993) (declining to consider prior decisions because the Court had never before "squarely addressed the issue"); Edelman v. Jordan, 415 U.S. 651, 670 (1974) (declining to follow prior decisions that did not "substantively treat" an issue); The Container Store v. United States, 864 F.3d 1326, 1333 n.4 (Fed. Cir. 2017) (quoting Brecht, 507 U.S. at 631, for the "'squarely addressed'" standard); United States v. Cty. of Cook, Ill., 170 F.3d 1084, 1088 (Fed. Cir. 1999) (stating that when prior decisions contain no "explicit rule" for decision, those opinions do not provide binding precedent on the issue (citing Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc., 937 F.2d 1572, 1581 (Fed. Cir. 1991))).

1.     Waiver of Plaintiff's Contract Claims

a.     Whether FAR 30.606 Applies to this Contract

Plaintiff asserts that FAR 30.606 is "extra-contractual," and notes that this FAR provision is not incorporated in the contract by full text or by reference in the list of FAR provisions included in the contract.  See ECF No. 20 at 53; ECF No. 22 at 7, 11, 14, 21; ECF No. 28 at 12 & n.5, 16.  While maintaining a challenge to the validity of FAR 30.606, plaintiff does not appear to dispute that FAR 30.606 is applicable to the administration of Boeing's contract with the United States.  See ECF No. 15 at 23-24; ECF No. 17 at 8; ECF No. 28 at 12-13 & nn.5-6.  Further, aside from an argument as to the contingent nature of the applicability of FAR 30.606, because cost accounting changes are somewhat unpredictable, plaintiff does not refute the fact that Boeing was fully aware of the existence and applicability of FAR 30.606 at the time it entered into the representative contract in December 2008.  ECF No. 16 at 20; ECF No. 28 at 14-15.  And, the court adds, "government contractors are presumed to have constructive knowledge of federal procurement regulations."  Gen. Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775, 780 (Fed. Cir. 1993) (citing Gen. Builders Supply Co. v. United States, 409 F.2d 246, 250-51 (Ct. Cl. 1969)).  FAR 30.606 applies to the representative contract.

b.     Whether the Applicability of FAR 30.606 Creates a Patent Ambiguity that Boeing Failed to Challenge

Although plaintiff offers numerous arguments for its position that no patent ambiguity existed in its contract with the United States, these arguments are unavailing. ECF No. 22 at 13; ECF No. 28 at 6, 15-17.  The complaint sets forth plaintiff's view that FAR 30.606 is a clear violation of the CAS statute and the CAS clause included in the

contract.  See ECF No. 1 at 9-23.  For plaintiff to prevail on its contract claims, its interpretation of the contract cannot bind the parties unless the ambiguity in the contract was latent, not patent.  See Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993) ("If a contract contains a patent ambiguity, the contractor is under a duty to inquire and must seek clarification of the proper contract interpretation.") (citations omitted); see also K-Con, Inc. v. Sec'y of Army, 908 F.3d 719, 723 (Fed. Cir. 2018) (holding that because the solicitation contained a patent ambiguity, the contractor's failure to seek clarification of the ambiguity prevented the contractor's interpretation of the contract from binding the parties) (citation omitted); Interwest Constr. v. Brown, 29 F.3d 611, 615-16 (Fed. Cir. 1994) ("Because [plaintiff] did not seek clarification of the performance requirements, it cannot now secure an equitable adjustment arising from the alleged ambiguity." (citing Community Heating, 987 F.2d at 1579)).

A government contractor has an obligation to inquire as to patent ambiguities in a solicitation.  This duty is described in the following excerpt from a Federal Circuit decision:

> If [plaintiff's] claims of ambiguity among the evaluation terms are correct, the ambiguity would be patent and not latent.  A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties.  Thus, [plaintiff] "had a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation."

Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380-81 (Fed. Cir. 2000) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

Moreover, if a contractor were allowed to postpone challenges to the contract's conditions of performance until after award, the fairness and openness of the competition would be thwarted.  That is, if a bidder wins a contract despite its knowledge of a patent ambiguity in the solicitation, and later seeks to address that ambiguity, the principles of fair competition are undermined:

> The patent ambiguity doctrine is a court-made rule that is designed to ensure, to the greatest extent possible, that all parties bidding on a contract share a common understanding of the scope of the project.  That objective is particularly important in government contracts, in which significant post-award modifications are limited by the government's obligation to use competitive bidding procedures and by the risk of prejudice to other potential contractors.

Triax Pac., Inc. v. West, 130 F.3d 1469, 1475 (Fed. Cir. 1997) (citation omitted).

It is fundamentally harmful to the competitive bidding process for the awardee to enter into a government contract while knowingly preserving a later challenge to the contract's terms which could significantly alter the costs paid by the government.  Cf. id. ("In addition, the duty of inquiry prevents contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations in preparing their bids and then, after the award, seeking equitable adjustments to perform the additional work the government actually wanted.") (citations omitted).  Also, as the Federal Circuit has noted, one of the principal benefits of the patent ambiguity doctrine is "avoiding costly litigation after the fact" of contract award.  Community Heating, 987 F.2d at 1580 (citing Newsom v. United States, 676 F.2d 647, 649 (Ct. Cl. 1982)).

The court finds that in the circumstances of this case, Boeing failed to inquire as to a patent ambiguity in its contract with the government.[7]  There also does not appear to be any real dispute that Boeing consistently entered into contracts with the government, after FAR 30.606 became effective, without challenging this regulation in any type of pre-award protest or negotiation with the government, before its contracts were awarded.  ECF No. 20 at 16-17, 46-47, 53, 55; ECF No. 22 at 15; ECF No. 27 at 12 & n.4; ECF No. 27-1 at 1-3; ECF No. 28 at 13-15.  Because Boeing did not seek clarification, before award, of the conflict it saw between the CAS clause and FAR 30.606, its contract claims are foreclosed as a matter of law.  Cf. Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443, 1446 (Fed. Cir. 1997) (finding that the contractor "waived the right to challenge the validity of the contract" clause when it made no timely objection to that clause prior to the contract's execution) (citations omitted); E. Walters & Co. v. United States, 576 F.2d 362, 368 (Ct. Cl. 1978) (holding that the contractor was estopped from bringing an untimely challenge to a contract clause, because the contractor's silence as to the operation of this clause had deprived the government of a "relatively painless alternative") (footnote omitted).  Further, even if the patent ambiguity doctrine might not, by itself, bar Boeing's contract claims in this suit, Boeing's repeated challenges to FAR 30.606, after this pre-existing regulation was applied to the administration of Boeing's government contracts, strongly indicate that the government's affirmative defense of waiver has merit.

        c.      Whether the CAS Statute Protects Contractors, the Government, or Both

---

[7]     Plaintiff, in its supplemental reply brief, argues that the government has not established the necessary factual predicate for the court's analysis of terms contained in the solicitation.  ECF No. 28 at 16 n.8.  The court observes that the government has not had an opportunity to respond to this argument, but in the court's view, the necessary factual predicate for an understanding of the solicitation is satisfactorily provided by the contract excerpts cited by both parties.  ECF No. 15-1 at 136-37; ECF No. 28-2 at 2-12.

The court must agree with defendant that the CAS statute and the CAS clause primarily benefit the government. ECF No. 27 at 17-19. The Federal Circuit has described the obligations the CAS statute, in relevant part, historically places on the contractor in the following manner:

> By regulation, a contractor that wishes to modify its accounting practices must first negotiate the terms and conditions under which the change will be made with the appropriate Divisional Administrative Contracting Officer ("DACO"). FAR 52.230-2(a)(4)(ii). If the accounting change results in increased costs because expenses previously accounted as indirect are now directly charged to the government contract, the contractor is required to agree to a contract price adjustment and repay the government any increased costs caused by the accounting change. FAR 52.230-2(a)(2), (a)(5). The regulations also state that the amount of the price adjustment is generally limited to the additional amount paid by the government "in the aggregate" over "all of the contractor's affected CAS-covered contracts and subcontracts." FAR 30.602-3 (1993); see 41 U.S.C. § 422(h)(3); FAR 52.230-2(a)(5).

Donley v. Lockheed Martin Corp., 608 F.3d 1348, 1350 (Fed. Cir. 2010). The CAS statute provides a mechanism, in other words, for ensuring that the contractor's accounting practices correctly identify contract performance costs related to government contracts. See, e.g., Raytheon Co. v. United States, 747 F.3d 1341, 1352 (Fed. Cir. 2014) ("Indeed, the relevant [CAS] provisions appear to be primarily focused on ensuring that the contractor complies with the CAS and follows uniform and consistent cost accounting practices.") (citations omitted).

Given that the CAS statute primarily protects the government from unwarranted contract performance costs, the parties hotly debate the significance of provisions within the CAS statute that could be described as protective of contractors. Plaintiff points to commentary from the Federal Circuit that indicates that the CAS statute prohibits windfalls to the government, through language now codified in 41 U.S.C. § 1503(b). See DIRECTV Grp., Inc. v. United States, 670 F.3d 1370, 1378 (Fed. Cir. 2012) ("The Court of Federal Claims correctly held that such a windfall is prohibited by the CAS statute.") (citations omitted). Plaintiff also relies on Chris Berg, Inc. v. United States, 426 F.2d 314 (Ct. Cl. 1970), for the proposition that a contractor may challenge the agency's compliance with a statute or regulation that is not solely for the benefit of the contractor. ECF No. 22 at 17; ECF No. 28 at 10-11 & nn.2-3.

Defendant cites to a Federal Circuit decision which recognizes the authority of Chris Berg, among other seminal cases, but concludes that:

> if the primary intended beneficiary of a statute or regulation is the government, then a private party cannot complain about the government's

15

failure to comply with that statute or regulation, even if that party derives some incidental benefit from compliance with it.

Cessna Aircraft Co. v. Dalton, 126 F.3d 1442, 1451-52 (Fed. Cir. 1997) (citing Rough Diamond Co. v. United States, 351 F.2d 636, 642 (Ct. Cl. 1965); Hartford Accident & Indem. Co. v. United States, 127 F. Supp. 565, 567 (Ct. Cl. 1955)).  In a more recent Federal Circuit decision, the court rejected the proposition that contractor claims were foreclosed if the statute or regulation primarily benefited the government, because "it is possible for a regulation or law to benefit both the government and a class of private parties." Todd Constr., L.P. v. United States, 656 F.3d 1306, 1314 (Fed. Cir. 2011) (citing Rough Diamond, 351 F.2d at 640).

Relying on Chris Berg, DIRECTV and Todd Construction, plaintiff's contract claims in this suit are not foreclosed simply because these claims challenge the government's compliance with a statute that primarily benefits the government.  The court does not find, however, that these three cited cases foreclose defendant's affirmative defense of waiver.  Binding precedent must be examined further to resolve the waiver issue.

d.     LaBarge and AT & T II

The parties rely on a number of Federal Circuit decisions that substantively address the doctrine of waiver.  The question before the court, however, is how that doctrine applies to a plaintiff that has entered into a contract with the government, and who challenges the government's adherence to a pre-existing regulation in the administration of the contract, on the basis that the government's adherence to the regulation allegedly violated some other legal duty.  It is to that relatively narrow question that the court must apply the most analogous binding precedent on the topic of waiver.  After due consideration of all of the cases cited by the parties in this regard, the court will discuss the following two decisions:  LaBarge Products, Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1995), and American Telephone & Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) (AT & T II).[8]

LaBarge Products, Inc. (LaBarge), appealed the Armed Services Board of Contract Appeals (Board) decision which denied LaBarge's contract reformation claim. LaBarge, 46 F.3d at 1548.  The underlying contract was for the supply of pipe couplings to the United States Army.  Id.  One Army official (Officer A) tried to steer the award to

---

[8]     Plaintiff also relies on Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988).  ECF No. 22 at 17-18; ECF No. 28 at 10.  The discussion of waiver in that opinion, however, focused on a challenge to an inaccurate price index incorporated into a clause of the contract.  Beta, 838 F.2d at 1184-86 & n.3.  The court finds no compelling parallel between the facts of Beta and Boeing's representative contract.

a preferred contractor through a sole source procurement, but a competitive procurement vehicle was used nonetheless. Id. at 1549.  The preferred contractor was notified by another Army official (Officer B) that LaBarge had submitted the lowest bid for pipe couplings; the preferred contractor was the second lowest bidder.  Id.

A third Army official (Procurement Manager) requested that the offerors submit best and final offers (BAFOs), which would "include confirmation that the contractor would accept option provisions for the government to purchase production tooling and level three production drawings." Id.  LaBarge's president believed that the request for BAFOs was an attempt to steer the award away from his firm; yet, he expressed LaBarge's intent to "not lose" the contract, and told the Procurement Manager the approximate price of LaBarge's upcoming BAFO.  Id.

After the request for BAFOs issued, the news of LaBarge's expected BAFO price was leaked to the preferred contractor.  Id.  LaBarge was unaware that its expected price had been leaked to the preferred contractor, but, by a stroke of apparent good fortune, its BAFO continued to be the lowest priced offer.  Id.  Less luckily, Officer A intervened again and "attempted to have [LaBarge] declared technically deficient and unacceptable by requesting an additional evaluation of the company." Id.  The Procurement Manager refused Officer A's request.  Id.

On the verge of the announcement that LaBarge had won the contract, the preferred contractor filed a pre-award bid protest with the General Accounting Office (GAO), now known as the Government Accountability Office.  Id.  The preferred contractor revealed to the GAO that two leaks of LaBarge's prices had disfavored LaBarge in the procurement.  Id. at 1549-50.  LaBarge joined the GAO protest, arguing that preferential treatment had been given to the preferred contractor.  Id. at 1550.  In particular, LaBarge contended that the BAFOs were tainted by this preferential treatment, and that award should be made based on its first lowest offer, not on LaBarge's even lower BAFO.  Id.

Even though the preferred contractor's GAO protest was denied, LaBarge's request that its initial lowest offer be the basis for award, not its BAFO, was not accepted by the Army; instead, the contract was awarded to LaBarge at its BAFO.  Id.  LaBarge successfully completed the contract.  Id.  LaBarge attempted to reform the contract to reflect its initial price by submitting a claim to the contracting officer, as follows:

> LaBarge submitted a claim to the contracting officer in which it sought to have the coupling contract reformed to the August 16, 1984 bid price.  This would have resulted in a total contract price increase of about $800,000. LaBarge claimed that reformation of the contract to the higher price was necessary in order to compensate it for the improper acts of certain Army personnel involved in the procurement.  LaBarge asserted that there had been a conspiracy to direct the contract to [the preferred contractor] even though

> LaBarge had submitted the low bid in response to the RFP.  According to LaBarge, its August 16 bid had been disclosed to [the preferred contractor] and the best and final offer round was merely a "sham."  LaBarge claimed that, but for improper conduct, it would have been awarded the coupling contract at its higher, initial bid.  LaBarge's allegations were based upon information it received during the [GAO] protest and upon information contained in an Army investigative report dated May 15, 1985, a copy of which LaBarge received after the contract had been awarded.

LaBarge, 46 F.3d at 1550.  LaBarge's claim was denied both by the contracting officer and the Board.

Most pertinent here, the Federal Circuit considered whether LaBarge, in support of its contract reformation claim, was estopped from arguing that the government had violated a regulation prohibiting auction techniques after LaBarge had adhered to and performed the contract as written.  Id. at 1552-53.  The Federal Circuit's holding in this regard is instructive, and is reproduced here in relevant part:

> [I]f government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence or failure to protest.  In cases in which a breach of law is inherent in the writing of the contract, reformation is available despite the contractor's initial adherence to the contract provision later shown to be illegal.  Like the contractor in Chris Berg, Inc., LaBarge may seek reformation of its price term, even after performance, if that term was allegedly diminished by unlawful government acts.

Id. at 1552-53 (citing Chris Berg, 426 F.2d at 317-18; Rough Diamond, 351 F.2d at 639-43).  It should be noted that Chris Berg, like LaBarge, addressed unlawful conduct of procurement officials that occurred at the time the offerors' bids were considered for award.  See Chris Berg, 426 F.2d at 318 ("This analysis establishes that the award of the contract to plaintiff at the bid price, with knowledge of [plaintiff's mathematical] mistake and over its protest, was a clear-cut violation of law.").

Although LaBarge offers plaintiff some aid, the LaBarge decision does not offer Boeing sufficient support to overcome the application of waiver in this case.  The holding in LaBarge confirms that a contractor does not always waive its challenges to unlawful conduct inherent in the writing of a contract that the contractor signs and performs.[9]  46

---

[9]     Unlike the circumstances of LaBarge and Chris Berg, much of the illegality alleged by plaintiff occurred, if at all, when FAR 30.606 was promulgated, three years before the representative contract was signed.  ECF No. 11-1 at 28-40; ECF No. 16 at 22-36.

F.3d at 1552-53.  But in the court's view, it would be an improper extension of LaBarge to conclude that a sophisticated contractor like Boeing can enter into a contract with the government, in this case three years after FAR 30.606 went into effect, and not waive a challenge to the legality of that regulation.

For more analogous precedent, the court now turns to AT & T II.  AT & T II addressed another contract reformation claim, this one brought by one of the largest federal contractors, American Telephone & Telegraph Company (AT & T), a company which in that era performed federal contracts worth over $2 billion dollars.  307 F.3d at 1377, 1380.  The underlying contract was with the United States Navy, for the "develop[ment of] detection technology for tracking ultra-quiet submarines of the Soviet Union."  Id. at 1376.

AT & T was awarded a fixed-price contract for an element of this system, known as a "reduced diameter array (RDA)."  Id.  "AT & T eventually performed the RDA contract at a cost of over $91 million, greatly in excess of the contract's adjusted final price of about $34.5 million."  Id. at 1377.  AT & T sought to have the contract reformed, after performance, so that its payments under the contract would be on a cost reimbursement basis, rather than at a fixed price.  See id. at 1380 ("As a sophisticated player, AT & T bargained for and won a fixed-price contract[;] . . . the record simply provides no evidence that AT & T sought a cost reimbursement contract during contract negotiations").

Plaintiff attempts to distinguish AT & T II on the basis that the violation of law alleged in AT & T II was of a statute that did not benefit contractors.  ECF No. 22 at 19 (citing AT & T II, 307 F.3d at 1379).  The court must disagree, based on an en banc ruling by the Federal Circuit, American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) (AT & T I).  The following passage in AT & T I confirms that the statutory provision alleged to have been violated in the writing and administration of AT & T's contract with the Navy was for the benefit of both the government and contractors:

> The accompanying Conference Report reiterated congressional concern that the risks of failure and of cost uncertainties be allocated equitably between government and contractor, and stressed the desire to "maintain the government's credibility as a reliable business partner."  Congress referred to the burden of a fixed price contract on the contractor when the miscalculation of development cost may have been that of the government agency as well as the contractor, and to the reluctance of some highly qualified firms to enter into such contracts. The Conference Report was unambiguous: "Fixed price contracts are normally not appropriate for research and development phases."  Thus Congress acted to adjust the risks of developing the advanced technologies needed in the service of national defense.

AT & T I, 177 F.3d at 1372 (citations omitted).

The Federal Circuit panel in AT & T II was bound by AT & T I and cannot be presumed to have reinterpreted the relevant statute, sub silentio, as being purely for the benefit of the government.  See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc., 880 F.3d 1356, 1361 n.2 (Fed. Cir. 2018) (noting that the Federal Circuit in that case was bound by precedent established by a prior en banc decision); Crowley v. United States, 398 F.3d 1329, 1335 (Fed. Cir. 2005) (holding that a de novo statutory interpretation is not permitted where binding precedent has already interpreted the statute).  As the en banc Federal Circuit indicated, "Congress can not have intended to charge the contracting partner with adverse consequences depending on whether" the government complied with the relevant statute.  AT & T I, 177 F.3d at 1375.  It is instructive, too, that AT & T I relied on LaBarge for its analysis of the consequences of the Navy's failure to comply with the relevant statute—LaBarge addressed a contractor claim that was founded on the alleged violation of a regulatory provision that was intended to benefit, at least in part, government contractors.  See id. at 1376 (citing LaBarge, 46 F.3d at 1552-53); see also LaBarge, 46 F.3d at 1552 (noting that the regulation alleged to have been violated in that case was "plainly for the benefit of the contractor").  The court does not find plaintiff's first attempt to distinguish AT & T II, on the grounds that the statute at issue in that decision was purely for the benefit of the government, to be availing.

Plaintiff's second attempt to distinguish AT & T II is presented in its supplemental reply brief, to which the government has not had an opportunity to respond.  Plaintiff contends that in AT & T II, there was an express term of the contract that AT & T "negotiated and accepted," i.e., that payment would be on a fixed-price basis, whereas here Boeing merely was contending with "a contract administration rule like FAR 30.606(a)(3)(ii)."  ECF No. 28 at 17 (citing AT & T II, 307 F.3d at 1380-81).  While the court would agree that there are factual differences between this case and AT & T II, there is also a core similarity.  When AT & T chose to enter into a fixed-price contract with the Navy, it accepted the financial framework for its payment under the contract.  Here, Boeing accepted the representative contract's financial framework, including FAR 30.606, for its payment under the contract.  The court concludes that AT & T II and this case are sufficiently factually similar that AT & T II should guide this court's waiver analysis.  Cf. 307 F.3d at 1381 ("[C]ompetition on a cost-reimbursement basis may have taken AT & T out of the game[;] . . . this court is not inclined to change the rules and the scoring after the game has been played.").

Of further note for analytical purposes in this case, the AT & T II decision emphasized the fact that AT & T was a large and sophisticated government contractor.  307 F.3d at 1380; see also id. at 1382 (Newman, J., dissenting) (noting the "stress" placed by the panel majority on the fact that AT&T was a sophisticated contractor).  In that decision, the Federal Circuit also commented that AT & T had underbid its competitors, and that the results of that competition might have been different if the financial

framework, i.e., cost reimbursement vs. fixed price, had been different. AT & T II, 307 F.3d at 1380-81. In addition, the Federal Circuit noted that the negotiated price of a government contract is a fundamental element of the bargain struck between the contractor and the federal government. Id. Here, as in AT & T II, Boeing is a large and sophisticated contractor seeking to change the pricing framework for its contract, years after the competition for that contract ended.

Providing the most applicable binding precedent on the issue of waiver in this matter, the Federal Circuit held in AT & T II as follows:

> In short, the proper time for AT & T to have raised the issues that it now presents was at the time of contract negotiation, when effective remedy was available. This, AT & T did not do. For reasons evident above, even were AT & T to have stated a valid claim for reformation, this court's case law would require a finding that AT & T waived that claim.

Id. at 1381 (citing Whittaker, 124 F.3d at 1446; E. Walters, 576 F.2d at 367-68). Applying the holding in AT & T II to the facts of the instant case, in full consideration of LaBarge and the other cases cited by plaintiff, the court finds that Boeing waived its challenge to FAR 30.606 when it entered into the representative contract. Although plaintiff charges the government with trying to reap an "extraordinary windfall" by applying FAR 30.606 to this contract, ECF No. 11-1 at 7, plaintiff's contract claims attempt to "change the rules and the scoring after the game has been played," AT & T II, 307 F.3d at 1381, and thus are foreclosed as a matter of law.

Because all of plaintiff's contract claims are waived as matter of law, summary judgment must be granted to defendant on these claims. Count I, Count II, and Count III must be dismissed on the merits. The court now turns to waiver as it might apply to plaintiff's illegal exaction claim.

### 2.	No Waiver of Plaintiff's Illegal Exaction Claim

Earlier in this opinion, the court held that it lacked jurisdiction over plaintiff's illegal exaction claim, following Norman and Cyprus Amax. The court sets forth here its analysis of the government's affirmative defense of waiver, as it might apply, in the alternative, to plaintiff's illegal exaction claim.

Defendant asks this court to extend AT & T II and its holding on waiver to all of plaintiff's claims, not just its contract-based claims. ECF No. 27 at 15 (citing AT & T II, 307 F.3d at 1380-81). Although AT & T II does mention that AT & T raised "a variety of unsupported legal theories to support its claim," 307 F.3d at 1380, the analysis and holding on the topic of waiver was distinctly focused on AT & T's contract reformation claim, id. at 1380-81. Defendant's reliance on AT & T II to show that Boeing waived its illegal exaction claim is not well-supported.

Defendant's position—that all contractor claims founded on the infirmities of a regulation that was in effect at the time of contract execution are waived—has a certain appeal.  ECF No. 27 at 17, 19.  But defendant's reliance on Community Heating, 987 F.2d at 1580, as support for this proposition is ineffective.  Id. at 17.  Not only is the topic of waiver of an illegal exaction claim not addressed in Community Heating, but the appeal in that case was from a forum that does not have jurisdiction over illegal exaction claims.  987 F.2d at 1577.  Therefore, Community Heating could not have addressed the waiver of illegal exaction claims, even by implication.  Defendant has failed to show that Boeing waived its illegal exaction claim.

## IV.  Conclusion

Defendant's combined motion to dismiss and motion for summary judgment, ECF No. 15, is **GRANTED**.  Because no genuine dispute of material fact exists and plaintiff's contract claims are foreclosed as a matter of law, Count I, Count II, and Count III must be dismissed on the merits.  Count IV must be dismissed for lack of subject matter jurisdiction.

Accordingly,

(1)     Plaintiff's motion for judgment on the pleadings, ECF No. 11, treated as a motion for summary judgment, is **DENIED**;

(2)     Defendant's motion to dismiss or, in the alternative, motion for summary judgment, ECF No. 15, is **GRANTED**;

(3)     The clerk's office is directed to **ENTER** final judgment for defendant, **DISMISSING** Count I, Count II, and Count III of plaintiff's complaint, with prejudice, and **DISMISSING** Count IV of plaintiff's complaint, without prejudice, for lack of subject matter jurisdiction; and

(4)     No costs.

IT IS SO ORDERED.


s/Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Judge